IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ALLEN ALEXANDER NEWSOME, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:17-CV-187-Z |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
TO DENY PETITION FOR A WRIT OF HABEAS CORPUS**

Before the Court is the *Petition for a Writ of Habeas Corpus by a Person in State Custody* filed by petitioner ALLEN ALEXANDER NEWSOME challenging the constitutional legality or validity of his state court conviction and sentence. For the following reasons, petitioner's habeas application should be DENIED.

I.
STATEMENT OF THE CASE

On December 22, 2005, 7-year-old D.S. told an adult family friend (known to D.S. as her "aunt") that petitioner, her uncle by marriage, had "raped" her, the last time occurring only a couple of days or weeks earlier. After explaining that "rape" meant that "he stuck his middle part in me," D.S. stated such assaults began when she was four years old and had taken place at the home D.S., her mother and siblings shared with petitioner, his wife (D.S.'s aunt) and cousins, as well as at petitioner's workplace. D.S. told her "aunt" the assaults happened "all the time," every time her mother and aunt would go to work, and sometimes when petitioner would sneak her into his room at night. D.S. also told the "aunt" her two male cousins with whom she was residing (approximately ages 9 and 11) had also "raped" her and, further, that

her female cousin (approximately age 12) had inappropriate sexual contact with her. D.S. additionally stated petitioner had made the male cousins also "be with" D.S.'s older sister A.S., who was 9 years old at the time.[1]  [ECF 15-12 at 38-40].

That same night, D.S. and A.S. were examined by a Sexual Assault Nurse Examiner ("SANE") at Northwest Texas Hospital concerning the sexual assault allegations. The examination record, admitted at trial, indicated D.S. related to the SANE that petitioner "did nasty stuff to me," "tried to rape me," "put his middle spot (points to genitals) inside me," and provided details of a specific instance of penetration of D.S.'s female sexual organ with petitioner's sexual organ. The record reflected D.S. also related an instance where petitioner tried to suffocate her with a pillow and told her not to tell anyone. D.S. indicated these assaults took place in Amarillo, as well as in other surrounding towns where they had lived. The record also reflected D.S. detailed an episode of sexually inappropriate behavior with her female cousin and stated her male cousins also penetrated her female sex organ with their sex organs "all the time too." [ECF 15-13 at 12]. Physical examination revealed D.S.'s hymen was absent from the 5 o'clock to the 9 o'clock position and that the remaining hymen consisted of thick and irregular tissue. [*Id.* at 14]. Exam did not reveal any other trauma to D.S.'s genitalia or body.[2]  [*Id.* at 13].

D.S. was subsequently interviewed at The Bridge Children's Advocacy Center where she was videotaped making various allegations.[3]

The next day, December 23, 2005, police officers interviewed petitioner during which he averred he did not "do it" and did not "touch" D.S. and told the officers that his mother-in-law (D.S.'s grandmother) would be the origin of any such allegations, as she had repeatedly made the same type of unfounded allegations with regard to other children for the past 4-5 years, typically around the time he

---

[1]A.S. also made accusations of sexual assault against her male cousins at that time. [ECF 15-12 at 43].

[2]Although not part of the record, it appears A.S.'s examination did not reveal any trauma or vaginal penetration. [ECF 15-12 at 41, 43].

[3]The record does not contain the video, a transcription of the interview, or any testimony concerning the content of the interview at The Bridge.

would be expecting a federal income tax refund.  [ECF15-12 at 127-28].  Petitioner then provided a written statement wherein he detailed his activities for December 20, 2005 (three days prior), the date police had determined was the last alleged sexual assault date.  Petitioner did not mention D.S. in his listed daily activities or otherwise reference D.S. in the statement.  Instead, petitioner averred he had previously advised his sister-in-law (D.S.'s mother), who was living with petitioner and his wife at the time, to "get her daughter away" from her mother (petitioner's mother-in-law) as she would "brain wash these kids to make them say whatever she want[ed]."  [ECF 15-13 at 9].  Petitioner's statement did not specifically deny the accusations being made by D.S.; instead, it appeared to accuse the mother-in-law of being the source of the allegations being lodged against him.  Investigating officers did not ask petitioner to submit to DNA testing, nor did they seize any bedding from the home or any of D.S.'s clothing to test for semen or DNA.

On October 10, 2006, petitioner was charged by Complaint in Potter County, Texas with two (2) counts of the first degree felony offense of aggravated sexual assault in violation of section 22.021(a)(2)(B) of the Texas Penal Code.  *State v. Newsome*, No. 54,512-B.  [ECF 15-7 at 5-6].  Specifically, the Complaint alleged that on or about December 20, 2005, petitioner committed aggravated sexual assault of a child younger than 14 years of age by causing the penetration of the victim's female sexual organ by petitioner's sexual organ (Count One), and the penetration of the victim's anus by petitioner's sexual organ (Count Two).  The officer's affidavit to support the Complaint averred that the charges were based on the following:

> The offense reports reflect that law enforcement officers learned the following facts after investigating the offense alleged above.  The seven year old victim [D.S.] is the niece of [petitioner].  [D.S.] disclosed to her maternal aunt that the [petitioner] was "put[ting] his middle part inside of [her]."  She said that it happened every time she has to stay with [petitioner] when her mother and her aunt, the [petitioner's] wife were at work.  During her interview at the Bridge Child Advocacy Center, [D.S.] said that her uncle took her to his work, made her lay on the floor, and then penetrated her vagina with his penis. At the Bridge, she also disclosed anal penetration.  A subsequent sexual assault exam revealed physical findings consistent with the history she gave the sexual assault nurse examiner.  [D.S.] told the SANE that her uncle put his "middle spot, inside [her]."

On April 25, 2007, petitioner was charged by grand jury Indictment in Potter County, Texas with the same two (2) counts of aggravated sexual assault. *State v. Newsome*, No. 54,512-B. [*Id.* at 17].

Based on representations made by petitioner in his pleadings, it appears the State may have offered petitioner a plea agreement whereby in exchange for pleading guilty to Count 1, the State would recommend he receive a 25-year sentence and would dismiss Count 2. Petitioner avers he refused such a plea offer.

On May 12-13, 2008, petitioner, represented by retained counsel, was tried before a jury in the 181st District Court of Potter County.[4] [ECF 15-11 at 176-232; 15-12 at 7-222]. At the start of the trial, both counts of the Indictment were read aloud before the jury and petitioner pleaded not guilty to both. [ECF 15-11 at 176-77]. The State also referenced both manners of sexual assault (penetration of the female sexual organ as well as anus) in its opening statement.

At trial, D.S., now age 9, testified unequivocally that petitioner sexually assaulted her by penetration of her female sexual organ with his sex organ from age 4 to age 7. [ECF 15-11 at 186-210; 15-12 at 19-29]. D.S. described in detail the last sexual assault that had occurred 1-2 weeks prior to telling her "aunt" of petitioner's actions. [ECF 15-11 at 198-200]. D.S. denied, however, that petitioner had ever touched or "messed with" her "behind," and denied telling anyone at The Bridge that he had. [*Id.* at 201-02; 15-12 at 27]. D.S. further testified she had also been sexually assaulted, by vaginal penetration, during this same time period by her 9 and 11-year-old male cousins, one time each, and that her 12-year old female cousin had inappropriate sexual contact with both she and her sister. [ECF 15-12 at 20-23].

The SANE also testified at trial, reciting what D.S. had told her as history for the examination record and describing D.S.'s statements during the exam as extremely graphic and knowledgeable for a 7-year-old. The SANE also provided detailed testimony regarding the examination of D.S.'s vaginal area,

---

[4]The case was originally set on the trial docket for the week of March 10, 2008. However, the State filed a motion for continuance asserting: "Although all necessary witnesses have been contacted, this contact is recent and the victim in this case is not yet sufficiently comfortable with the attorney representing the state to adequately present the facts necessary to prove this case. An additional month will give the state the time necessary to prepare this witness for the trial in this case." The State's motion was unopposed and granted. [ECF 15-7 at 22].

including not only her finding that D.S.'s hymen was partially missing, but that the edges of what remained were made up of thick, irregular tissue described as "scarring" and her opinion that such was indicative of chronic vaginal penetration typically found in a sexually active adult female.  [*Id.* at 30-46, 75-85].

The "aunt," the first person to whom D.S. made the allegation of petitioner's sexual assaults, also testified as to what D.S. had told her.  This testimony was substantially consistent with the facts to which D.S. testified before the jury.  The "aunt" also gave her opinion that D.S. "always tells the truth," is "very truthful" with her, and would not just make up the accusations.  [*Id*. at 30-46].

The patrol officer who received the assault call indicated that at the hospital, he spoke to D.S.'s mother and took a statement from the "aunt" to whom the outcry accusations against petitioner were made.  The officer stated the December 20, 2005 offense date was the date he was told the last sexual assault took place.  [*Id.* at 47-56].  The investigating detective testified as to petitioner's complete cooperation in the investigation, denial of the charges and statements that his mother-in-law was behind the accusations, as well as to petitioner providing a statement.  The detective also acknowledged he did not collect any items from the home petitioner shared with D.S. to be tested for petitioner's DNA.  [*Id.* at 57-74].  The State's forensic scientist testified no third-party DNA was found on vaginal swabs taken from D.S. and that there was no request to test for evidence on bedding or clothing.  [*Id.* at 86-93].  The State did not call any additional witnesses for its case-in-chief.

Petitioner testified at trial, adamantly denying any sexual impropriety with D.S. and directly asserting his innocence of the charges.  [*Id.* at 122, 124, 194-95].  Petitioner testified his mother-in-law, D.S.'s grandmother, had repeatedly made unfounded accusations that he was sexually assaulting male and female children in the family when he stopped financially supporting her.  [*Id*. at 117-19].  Petitioner explained no formal charges had ever been pursued.  [*Id.* at 119].  Petitioner also testified that D.S. came to and stayed at his house several times after she made the initial accusation.  Petitioner acknowledged D.S.'s trauma to her sexual anatomy indicated someone was sexually assaulting her, but averred he was not the perpetrator and instead believed another unidentified member of the family was.  [*Id*. at 128-29].

Other defense testimony elicited at trial established that one of the alleged victims from the child sexual assault accusations initiated by petitioner's mother-in-law nine (9) years prior denied making any such allegations, as well as that the female cousin D.S. accused in her outcry statement, in the history to the SANE nurse and in her testimony of inappropriate sexual interaction when they were approximately 7 and 12 years old, respectively, denied the accusation and averred it was false. Defense testimony also revealed that petitioner's sister-in-law (D.S.'s mother) brought D.S. with her to visit her sister at petitioner's home approximately two (2) years after the accusations were made, possibly even allowing D.S. to spend the night, and that D.S. appeared comfortable around petitioner in a group photo in which D.S. was next to petitioner around that time. Defense counsel indicated he would be calling petitioner's mother-in-law (D.S.'s grandmother) to testify, who apparently had been present in the courtroom during part of the trial; however, the defense was unable to call her because she was never served with the subpoena issued by the State and the defense never issued its own subpoena. [*Id*. at 138-42].

After the defense rested, the State moved, outside the presence of the jury, to dismiss Count Two (alleging penetration of D.S.'s anus with petitioner's sexual organ). [*Id*. at 152-53]. The trial court then read the charge to the jury, referencing only the allegation of penetration of D.S's sexual organ with petitioner's sexual organ (Count 1). [*Id*. at 155-61].

In closing arguments, the State relied primarily on D.S.'s unequivocal testimony that petitioner "raped" her, "that he had put his middle part in her middle part and that he had put it inside her and that he had moved when he was doing this," and that he had done this "many times before." [*Id*. at 162]. The State noted as "corroborating" evidence: (1) the findings of the medical examination, as detailed by the SANE's testimony, that D.S.'s female sexual organ showed signs of repeated chronic penetration resembling that typically found in an adult sexually active female; and (2) D.S.'s consistent statements – to the "aunt" and the SANE, and her trial testimony.

Petitioner's primary defense to the charges, in closing and throughout the trial, was that D.S.'s testimony was either fabricated and the result of the mother-in-law's improper influence and coaching, or

was simply outrageous and not believable.  Defense counsel also attempted to illuminate purported inconsistencies and exaggerations in D.S.'s accusations, the lack of DNA evidence, and petitioner's cooperation and continued assertion of innocence.

On May 13, 2008, the jury found petitioner guilty of the offense of aggravated sexual assault of a child "as alleged in the Indictment" (specifically penetration of the female sexual organ by petitioner's sexual organ).  [ECF15-7 at 34; 15-12 at 180].  After hearing testimony at the punishment phase of the trial, including D.S.'s testimony that the sexual assaults occurred "mostly every day," the jury then sentenced petitioner to seventy-five (75) years imprisonment in the Texas Department of Criminal Justice, Correctional Institutions Division.  [ECF 15-7 at 42; 15-12 at 185, 216].  On that same date, the state trial court accepted the jury's verdict and sentence and entered a corresponding Judgment.  [ECF 15-7 at 48-50].

Petitioner, represented by appointed counsel, filed a direct appeal of his conviction and sentence to the Court of Appeals for the Seventh District of Texas arguing (1) the evidence was legally and factually insufficient to support the judgment, and (2) that the trial court had committed reversible error in allowing prior consistent statements of the complaining witness to be heard by the jury.  [ECF 15-8].  On December 10, 2009, the intermediate state appellate court affirmed petitioner's conviction and sentence.  *Newsome v. State*, 07-08-0217-CR [ECF 15-4].  Specifically, the court found the record reflected D.S. had been sexually assaulted by someone on more than one occasion, that nothing in the record disputed the findings of the SANE's examination, and that the record reflected D.S. had consistently named petitioner as the perpetrator of the offense in her trial testimony, her report to the SANE, and her outcry to her "aunt."  The court found petitioner's challenges to the verdict on the bases of the absence of DNA evidence and purported prior unfounded allegations of sexual impropriety made by D.S.'s grandmother (petitioner's mother-in-law) were simply challenges to the evaluation of the witnesses' credibility, an issue to which the court had to defer to the jury.  Petitioner did not timely seek direct review of the intermediate appellate

court's ruling by filing a petition for discretionary review (PDR) with the Texas Court of Criminal Appeals (TCCA).

Approximately 3½ years later, on July 6, 2013, petitioner purportedly placed a state application for habeas corpus relief in the prison mail system, such application being received and file-stamped by the Potter County District Clerk on July 11, 2013. [ECF 15-14 at 7-21]. By this first state habeas application, petitioner alleged as the sole ground that he was denied effective assistance of appellate counsel because counsel did not inform him of the intermediate appellate court's December 10, 2009 decision affirming his conviction or of his right to file a PDR challenging that ruling. The only relief petitioner requested in this first state habeas application was leave from the TCCA to file an out-of-time PDR. [*Id*. at 13]. In response, the State submitted an affidavit from petitioner's appellate counsel wherein he averred it was his "recollection" that he had notified petitioner, in writing, of his right to file a PDR but that he was unable to locate a copy of any written notice. [*Id*. at 25-26]. On September 18, 2013, the TCCA denied petitioner's state habeas application without written order, a ruling on the merits, thereby denying his request for an out-of-time PDR. *In re Newsome*, No. 80,117-01. [*Id.* at 2].

On June 16, 2014, petitioner purportedly placed a second state application for habeas corpus relief in the prison mail system, such application being received and file-stamped by the Potter County District Clerk on June 19, 2014. [ECF 15-16 at 5-24]. By his second state habeas application, petitioner alleged claims of ineffective assistance of trial counsel, denial of a fair trial for various errors or omissions, and insufficient evidence/actual innocence of the charged offense. [*Id*. at 11-13, 15, 17,19]. On August 13, 2014, the TCCA denied petitioner's second state habeas application without written order, a ruling on the merits. *In re Newsome*, No. 80,117-02. [ECF 15-15].

On September 11, 2017, petitioner purportedly placed the instant federal application for habeas corpus in the prison mail system. [ECF 3 at 12]. This Court received petitioner's application on September 21, 2017, at which time it was file-stamped and this federal habeas corpus proceeding opened. Petitioner submitted with his federal habeas application a pleading entitled *Memorandum of Law in*

*Support to Proceed Under McQuiggins vs Perkins* [ECF 4], as well as a motion to expand the record to include various records not admitted at trial, made a part of the record during direct appeal, or provided or made a part of the record during state habeas corpus proceedings.  [ECF 6].

II.
PETITIONER'S ALLEGATIONS

Petitioner contends he is being held in violation of the Constitution and laws of the United States for the following reasons:

1.    Petitioner was denied his constitutional right to due process when the State knowingly alleged false charges in Count 2 of the Indictment in an attempt to coerce petitioner's guilty plea to Count 1, and then proceeded to trial on those false charges in an attempt to turn the jury against him;

2.    Petitioner was denied his constitutional right to effective assistance of counsel because trial counsel:

   a.    aided the State in attempting to coerce petitioner's guilty plea to Count 1 in exchange for dismissing the false charges alleged in Count 2;

   b.    failed to seek dismissal of Count 2 prior to trial;

   c.    failed to move for a mistrial or dismissal of the case after D.S.'s testimony refuted facts necessary to support Count 2;

   d.    did not conduct any independent fact-finding investigation; instead, relying solely on the information the State provided;

   e.    failed to obtain expert medical or mental health expert witnesses for defensive or rebuttal testimony;

   f.    failed to interview petitioner's motion-in-law (D.S.'s grandmother) concerning her past, repeated, and unfounded allegations of petitioner's sexual abuse of several family members and her involvement in D.S.'s allegations, or to call her as a witness;

   g.    failed to prepare for a proper cross-examination of the SANE and, in fact, did not ask the State's medical expert witness any questions;

   h.    failed to obtain D.S.'s prior medical records or other medical history (presumably records regarding alleged previous injuries to D.S.'s genitalia);

        i.      failed to obtain Child Protective Services (CPS) records from Oklahoma and Texas which would reveal past investigations of both D.S's mother and grandmother (petitioner's mother-in-law) for neglect; and

        j.      failed to call an unidentified physician who purportedly acted as D.S.'s attending physician during her December 22, 2005 visit to NWTH.

3.      Petitioner was denied his constitutional right to due process because the State violated the rule under *Brady v. Maryland*, 373 U.S. 83 (1963) by intentionally and willfully withholding or failing to disclose exculpatory evidence in its imputed possession, to-wit:  CPS reports on D.S.'s mother and grandmother, D.S.'s medical records reflecting prior injuries to her female genitalia, a report made by D.S.'s mother to school authorities prohibiting D.S.'s father from contacting her at school because he was sexually abusing her, and additional medical records from a NWTH doctor who examined D.S. on December 22, 2005; and

4.      Petitioner was denied his constitutional right to due process because the State committed prosecutorial misconduct by (a) coercing D.S.'s mother's cooperation in prosecuting petitioner, and (b) by listing petitioner's mother-in-law (D.S.'s grandmother) as a witness for the State but then failing to call her, resulting in the defense being unable to call the witness.

III.
STATUTE OF LIMITATIONS

Title 28 U.S.C § 2244(d) imposes a one-year statute of limitations on federal petitions for writs of habeas corpus filed by state prisoners:

(1)      A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitations period shall run from the latest of –

      (A)      the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

      (B)      the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

      (C)      the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

      (D)      the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

IV.
RESPONSIVE PLEADINGS

On November 21, 2017, respondent filed a Preliminary Response asserting petitioner's habeas application should be dismissed as time barred.  [ECF 16].  In her Preliminary Response, respondent fully and accurately briefed statutory and case law regarding the 1-year statute of limitations in federal habeas corpus cases, as well as the application of equitable tolling of the limitation period in federal habeas corpus proceedings.  Respondent also set forth relevant dates in this case and analyzed the timeliness of petitioner's habeas application, specifically addressing petitioner's claims of a later discovery date as the beginning of the statute of limitations, a possible claim of equitable tolling, and his claim of "actual innocence" creating a gateway to hear any time-barred claim.

On January 3, 2018, petitioner filed a reply to respondent's Preliminary Response arguing his federal habeas application should not be time-barred because he did not delay in filing his petition after discovering new evidence of his actual innocence and, in fact, diligently pursued his new evidence and actual innocence claims.  Petitioner further notes respondent admits petitioner filed his federal habeas less than one year after he discovered the new evidence.  Petitioner attached to his reply two (2) sworn declarations of family members attesting when they advised petitioner of information petitioner asserts as new evidence of actual innocence.  [ECF 19].

The undersigned further notes petitioner has also filed several motions or requests seeking production or discovery of numerous documents and/or records that he avers he learned the existence of in October or November 2016 and that he contends will demonstrate he is actually innocent of the convicted offense of aggravated sexual assault.

V.
FINALITY OF CONVICTION

By responding to Question 18 in his form habeas application, petitioner effectively acknowledges his judgment of conviction "became final over one year" before filing the instant federal habeas petition. [ECF 3 at 10]. Therefore, with regard to the finality of petitioner's conviction, the undersigned makes the following findings and/or conclusions:

1.  Petitioner was sentenced on May 13, 2008. Petitioner filed a direct appeal of his conviction with the appropriate state intermediate appellate court who, on December 10, 2009, affirmed petitioner's conviction and sentence. Petitioner did not timely file a petition for discretionary review with the TCCA challenging the lower court's ruling.

2.  Petitioner's judgment of conviction became final on **January 11, 2010**, when the 30-day period to file a petition for discretionary review of the intermediate appellate court decision expired. Tex. R. App. P. 68.2(a); *see Roberts v. Cockrell*, 319 F.3d 690, 693-95 (5th Cir. 2002) (finality determined by when time for filing further appeals expires).

VI.
START OF THE LIMITATION PERIOD/ STATUTORY TOLLING

The limitations period shall run from the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review <u>unless</u> one of the circumstances set forth in 28 U.S.C § 2244(d)(1)(B), (C), or (D) clearly applies and triggers a later begin date. Here, in his application and throughout his numerous pleadings, petitioner appears to assert the 1-year limitation period should start on a date other than, and later than, the date his conviction became final on January 11, 2010. Specifically, in response to Question 18 of the form habeas corpus application, petitioner asserts:

[I]nformation obtained and facts was discovered October-November 2016 . . . information that has been recently discovered less than one year from the date of his federal habeas filing through due diligence. That it would be a miscarriage of justice and a manifest injustice not to hear the petitioner's claims.

By this statement, or other similar statements and arguments made throughout his pleadings, petitioner appears to argue the 1-year limitation period to collaterally challenge his state court conviction should not

begin until the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence, *see* 2244(d)(1)(D).

## A. Discovery Rule

Petitioner argues the 1-year statute of limitations in this case did not begin when his conviction became final; rather, he contends the limitation period only began when he discovered the factual predicate of his claims presented herein. Again, in summary, petitioner alleges as claims in this federal habeas corpus petition:

    1.    a denial of due process because of false charges being brought against him;

    2.    ineffective assistance of trial counsel;

    3.    a denial of due process because the State withheld exculpatory evidence; and

    4.    a denial of due process because of prosecutorial misconduct.

Petitioner now asserts, in his habeas application and subsequent pleadings, that he was told, in or about October – November 2016, that:

    1.    D.S., prior to making the outcry accusations against petitioner to her "aunt," had accused an uncle, a brother of D.S.'s father, of sexual assault and, as a result, the "aunt" had "kicked" D.S. out of her house;

    2.    D.S. had previously suffered and been treated for injuries to her genital area (as a result of falling from a tree and a bicycling accident) prior to making the accusations of sexual assault against petitioner and being examined by the SANE in connection with those accusations;

    3.    D.S.'s paternal grandfather, Benjamin Smith Sr., had gone to the Emergency Room (presumably on December 22, 2005, the date D.S. was examined by the SANE), and D.S.'s "attending doctor" told him at that time that D.S.'s injuries "were old;"

    4.    On an unknown date or time period, D.S.'s mother had told school employees at D.S.'s school that D.S's father, Rodney Smith, Sr., was not allowed to have contact with D.S. because he was sexually abusing her;

    5.    D.S.'s paternal grandfather, Benjamin Smith Sr., who was arrested and indicted for indecency by sexual contact with D.S. in 2009, told his sister, Elizabeth Walker (petitioner's great aunt), at the time of his arrest that just prior to D.S.

accusing him of the offense, he had caught D.S. stealing and smoking his cigarettes and had chastised her and the other children for such actions;

6.     D.S's maternal grandmother (petitioner's mother-in-law) had influenced D.S. to make similar allegations against others, including family, to get victim compensation monies to support the grandmother's crack habit;

7.     CPS investigations were opened in Oklahoma and Texas against D.S.'s mother and grandmother (petitioner's mother-in-law) for neglect, and D.S. and her siblings were "taken by CPS" when living in Oklahoma; and

8.     the State coerced D.S.'s mother (petitioner's sister-in-law) to cooperate in petitioner's prosecution by threatening to "lock her up and take her kids from her" if she did not.

Petitioner contends the limitation period thus did not begin until his "discovery" of this "new evidence" in October – November 2016.

The undersigned agrees with respondent, that when a petitioner alleges the limitation period begins to run on the date when a factual predicate could reasonably have been discovered under 2244(d)(1)(D), the later begin date of the period applies only to those constitutional claims supported by the later-discovered factual predicate.  *See Felder v. Varner*, 379 F.3d 113, 122 (3rd Cir. 2002); *see also Respondent's Preliminary Response* (numerous multi-circuit cases cited therein) [ECF 16 at 5-6].

Here, as noted above, petitioner asserts, in his first ground, that he was denied due process as a result of the State indicting petitioner for, and proceeding to trial on, what the State knew to be a false charge alleged in Count 2 (the count alleging anal penetration).  Petitioner's "discovery" of the purported new information in October -November 2016 set forth above has no bearing whatsoever on this allegation of wrongdoing by the State and the resulting denial of due process.  Consequently, petitioner is not entitled to a later begin date of the limitation period under section 2244(d)(1)(D) with regard to Ground One.

By his second ground, petitioner asserts various actions or inactions of trial counsel were deficient and amounted to a denial of his right to effective assistance of counsel (*see* Petitioner's Allegations, *supra*).  Petitioner contends the limitation period did not begin with regard to claim of ineffective assistance of counsel until his "discovery" of the above "new evidence" in October – November 2016. The above information petitioner was purportedly provided in 2016 has little, if any relation to petitioner's

Grounds 2.a. – g. and would not, in any way, postpone the start of the limitation period with regard to these claims.  Moreover, the alleged actions or inactions of counsel that petitioner claims were deficient were discoverable, and in fact known, at the time of petitioner's conviction or when the conviction became final.  Consequently, petitioner's alleged October - November 2016 "discovery," by word-of-mouth from relatives, of conclusory information regarding D.S., her "aunt," her grandfather, her mother, her mother-in-law, and certain school employees, does not delay the begin date of the limitation period with regard to these subparts of Ground Two.

Although petitioner's claims that counsel was also deficient for the failures alleged in Grounds 2.h. – j. may have been triggered by his receipt of the "word of mouth" information he received in October – November 2016, the standard for applying a later discovery date under section 2244(1)(D) is when petitioner *could have*, through the exercise of due diligence, discovered the facts on which his claims are based, not when he actually became aware of the facts.  *Cf. In re Young*, 789 F.3d 518, 528 (5th Cir. 2015) (the limitations period begins when the petitioner through due diligence could discover the important facts, <u>not</u> when the petitioner recognizes their legal significance.).  All of the hearsay information petitioner was purportedly given in October – November 2016 was in existence and available before trial.  Petitioner has not shown section 2244(d)(1)(D) applies to his claims under Ground 2 so as to provide a later begin date of the limitation period with regard to those claims.

In his third ground, petitioner asserts he was denied his constitutional right to due process because the State violated the *Brady* rule by withholding and failing to disclose exculpatory evidence in its imputed possession that would have aided the defense, *i.e.*, Texas and Oklahoma CPS records for D.S.'s mother and grandmother (petitioner's mother-in-law) which would have shown D.S. and her siblings were "taken by CPS" when living in Oklahoma; evidence from D.S.'s school district that D.S.'s mother had, at some unidentified time, told teachers and the principal that D.S.'s father was prohibited from contacting D.S. at school because he had been sexually abusing her; D.S's medical records reflecting prior injuries to her female genitalia; and additional medical records from a NWTH doctor who examined D.S. on December

22, 2005 when she was examined in relation to the sexual assault allegations against petitioner. Petitioner avers he "discovered" the factual predicates of his claims that the State withheld, from the defense, records or reports in their possession that contained possibly exculpatory evidence in November or December 2016.

Initially, the undersigned finds petitioner, crucially, offers nothing to support his allegations on the merits of this issue other than his own bald assertions, unsupported and unsupportable by anything else contained in the record. Petitioner has not demonstrated the existence of this evidence, that the State knew of this purported evidence, that the State was in imputed possession of such evidence but suppressed it, or that the purported evidence was material and favorable to the defense, in order to show a constitutional violation appropriate for federal habeas corpus relief. Consequently, as this claim cannot justify federal habeas corpus relief, any analysis of whether his discovery of this purported evidence to potentially support such a claim delayed the begin date of the limitation period is unnecessary. Even so, the undersigned further finds petitioner does not make any substantiated allegation as to when he "discovered" the State allegedly possessed but failed to disclose this purported evidence to him; rather, petitioner asserts only the dates he was told such records or reports may exist. Petitioner has not demonstrated section 2244(d)(1)(D) applies to his claims under Ground 3, thereby providing a later begin date of the limitation period with regard to those claims.

Lastly, petitioner argues he was denied his constitutional right to due process because the State committed prosecutorial misconduct by (1) coercing D.S.'s mother (petitioner's sister-in-law) to cooperate in petitioner's prosecution by threatening to "lock her up and taker her kids from her" if she did not; and (2) by tricking the defense into believing petitioner's mother-in-law would be called as a witness by listing her as a State witness so that the defense did not subpoena her, but then failing to call her, resulting in the defense being unable to call the witness.

Petitioner indicates his sister-in-law told his wife, who then informed him, of the basis of the coercion claim in or about October – November 2016 and, therefore, the "discovery rule" under

2244(d)(1)(D) should apply to delay the beginning of the statute of limitations as to this ground. Petitioner, however, does not submit any sworn affidavits or any other verified proof to support not only the assertion of coercion by the State, but also of the dates he discovered such alleged coercion; instead, petitioner simply makes bald assertions, unsupported and unsupportable by anything in the record, as to the State's purported coercion of a witness, as well as to the date he learned of such alleged coercion. Petitioner has not demonstrated section 2244(d)(1)(D) should be applied in this instance.

Further, with regard to his claims of alleged trickery and/or misconduct by the State with regard to failing to call D.S.'s grandmother (petitioner's mother-in-law) as a State witness at the trial, it is clear petitioner could have learned of the predicate of this claim, through the exercise of due diligence, at the time of trial. Petitioner has not shown the applicability of the discovery rule in section 2244(d)(1)(D) to this ground.

To the extent, if any, petitioner is attempting to raise, by his assertions of a delayed start date of the limitation period, any new claim that the evidence was insufficient to support his conviction, this claim was discoverable when petitioner's conviction became final on January 11, 2010 and petitioner is not entitled to a later begin date of the limitation period under section 2244(d)(1)(D). To the extent, if any, petitioner is attempting to assert an independent claim that he is actually innocent of the charged offense as demonstrated by this "newly discovered evidence," such a claim fails to state a cognizable, constitutional claim for federal habeas corpus relief. Consequently, any analysis of whether his discovery of this purported evidence to potentially support such a claim delayed the begin date of the limitation period is unnecessary.

## B. <u>Findings and Conclusions</u>

With regard to the start of the 1-year limitation period, the undersigned makes the following findings and conclusions:

1.      The record does not reflect any unconstitutional "State action" impeded or prevented petitioner from filing for federal habeas corpus relief.

2.    Petitioner's claims do not concern a constitutional right recognized by the United States Supreme Court within the last year and made retroactive to cases on collateral review.

3.    Petitioner's claims are not of such a nature that the factual predicate of the claims presented could not have been discovered, through the exercise of due diligence, until a date subsequent to the conclusion of petitioner's direct review of his conviction.

4.    The 1-year period of limitation in this case began on the date on which petitioner's judgment became final by the expiration of the time for seeking direct review under 28 U.S.C. § 2244(d)(1)(A), that is **January 11, 2010**.

5.    Petitioner's federal habeas corpus petition was thus due on or before **January 11, 2011**, unless statutorily or equitably tolled.

6.    Petitioner's state habeas applications challenging his conviction and sentence were, filed July 6, 2013 and June 16, 2014, were filed almost 2 ½ years <u>after</u> the limitation period had expired on January 11, 2011.  Consequently, the 1-year statute of limitations was not statutorily tolled.  *See Medley v. Thaler*, 660 F.3d 833, 834-35 (5th Cir. 2011).

VII.
<u>EQUITABLE TOLLING</u>

Petitioner also appears to assert throughout his pleadings that he has acted with "due diligence" in filing his federal habeas corpus application collaterally challenging his state conviction and sentence. The undersigned liberally construes petitioner's various comments as an assertion that he is entitled to equitable tolling of the limitation period.

The one-year statute of limitations on petitions for federal habeas relief by state prisoners is subject to equitable tolling.  *See Holland v. Florida*, 560 U.S. 631, 645 (2010).  However, a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his habeas rights diligently, and (2) that some "extraordinary circumstance" stood in his way and prevented him from effecting a timely filing.  *Id.* at 649.  The United States Supreme Court has reaffirmed "that the second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control."  *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. ___, 136 S. Ct. 750, 755 (2016) (emphasis original).  Equitable tolling can apply to the one-year limitation period of section 2244(d) only

in "rare and exceptional" circumstances. *Davis v. Johnson*, 158 F.3d 806, 810-11 (5th Cir. 1998). The diligence required for equitable tolling purposes is "reasonable diligence," not "maximum feasible diligence." *Holland*, 560 U.S. at 653. Equitable tolling principally applies where the petitioner is "actively misled" by the respondent about the cause of action or was prevented in some extraordinary way from asserting his rights. *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999). A "garden variety claim of excusable neglect" by the petitioner does not support equitable tolling. *Lookingbill v. Cockrell*, 293 F.3d 256, 264 (5th Cir. 2002).

Here, petitioner has not demonstrated he acted with the reasonable diligence required to justify equitable tolling of the limitation period. Petitioner did not file his state habeas application seeking leave to file an out-of-time PDR until more than 3 ½ years after the intermediate court's opinion affirming his conviction on direct appeal. Petitioner then waited an additional 9 months after the TCCA denied his state habeas application to file his second state habeas application challenging the constitutionality of his underlying conviction. Critically, however, petitioner then waited more than 3 years to file this federal habeas petition asserting the same grounds. Petitioner does not specifically explain his delays in this case, most notably the 3-year delay to file his federal habeas application after the denial of his second state habeas application, other than to assert he acted with due diligence to file after receiving the new information referenced above in October – November 2016. The undersigned notes, however, that even after receiving such "information," petitioner still waited an additional 10 months to file his federal habeas application. Petitioner does not allege facts showing he pursued review of his claims with the requisite reasonable diligence necessary for equitable tolling of the limitation period, particularly given the extensive length of delay in filing this federal habeas proceeding.

Petitioner appears to assert he is nonetheless entitled to equitable tolling because extraordinary circumstances beyond his control stood in his way and prevented him from effecting a timely filing. Petitioner again appears to rely on his October – November 2016 receipt of the new "information" referenced above to argue such receipt qualifies as a rare and exceptional factor or circumstance

warranting equitable tolling of the limitation period. Petitioner submits the sworn declarations of a great uncle and a great aunt reflecting they provided petitioner with the certain new "information" referenced above in October - November 2016.[5] [ECF 19 at 7-8].

Even if this Court could disregard petitioner's failure to meet the due diligence prong of the equitable tolling test and could, instead, look solely to the second prong to justify equitable tolling, the undersigned would not find the necessary extraordinary circumstances beyond petitioner's control causing the delay in filing exist here. Petitioner's late or delayed receipt of information, referencing evidence or factual scenarios that may or may not exist, that may or may not have led to the discovery of such evidence, whether admissible or not, and that may or may not have been used in support of his defense at trial, does not, in any way, explain how petitioner was fully prevented from pursuing relief from what he contends is an invalid conviction. Not receiving such information until October – November 2016 did not otherwise make it impossible for petitioner to meet the federal habeas corpus filing deadline itself, even if certain claims may not yet have been available. Receipt of such information was not an extraordinary circumstance that totally prevented him from seeking post-conviction relief from his conviction. The undersigned finds this argument is without merit.

Petitioner fails to demonstrate he pursued his claims with reasonable diligence, or that extraordinary circumstances beyond his control, qualifying as "rare and exceptional" events, actions or conditions, prevented him from timely seeking post-conviction relief from his conviction. Consequently, petitioner fails to demonstrate equitable tolling of the limitation period for filing a federal petition is warranted or that he is entitled to any specific periods of equitable tolling.

VIII.
ACTUAL INNOCENCE

In his application, petitioner contends "he is actually innocent of the underlying criminal offense,

---

[5]With regard to the new information allegedly provided by his wife in October 2016 that her sister (D.S.'s mother) revealed she was coerced by the State into cooperating in the prosecution, neither the content of the wife's purported statement nor the approximate date she disclosed this information is supported by a sworn declaration in the record.

that no juror, acting reasonably would have voted to find him guilty beyond a reasonable doubt and in light of the new facts and information. That it would be a miscarriage of justice and a manifest injustice not to hear the petitioner's claims." [ECF 3 at 10]. In his *Memorandum of Law in Support to Proceed Under McQuiggins vs Perkins* filed with his application, petitioner asserts he can establish an actual innocence exception to overcome the procedural bar in this case, *viz.*, the limitations bar. For purposes of this discussion, the Court finds petitioner is specifically arguing actual innocence *as a gateway* for this Court to consider his time-barred claims.

A credible showing of "actual innocence" may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1931 (2013). "This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* (*quoting Herrera v. Collins*, 506 U.S.390, 404, 113 S.Ct. 853 (1993)). A habeas petitioner who seeks to surmount a procedural default through a showing of "actual innocence" must support his allegations with "new, reliable evidence" that was not presented in the underlying proceedings and must show that it was more likely than not that, in light of the new evidence, no fact finder, acting reasonably, would have found the petitioner guilty beyond a reasonable doubt. *See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995*); see also House v. Bell*, 547 U.S. 518 (2006) (discussing at length the evidence presented by the petitioner in support of an actual-innocence exception to the doctrine of procedural default). "Actual innocence" in this context refers to <u>factual</u> innocence and not mere legal sufficiency. *Bousely v. United States*, 523 U.S. 614, 623-24 (1998). Here, petitioner argues he is factually innocent of committing the aggravated sexual assault offense of which he was convicted and thus is entitled to an exception to the procedural time bar based on his actual innocence.

As "new, reliable evidence" of his <u>factual</u> innocence of the aggravated sexual assault of D.S. by causing the penetration of her sexual organ by petitioner's sexual organ, petitioner offers the same information he was provided in October – November 2016, set forth in the *Discovery Rule* discussion,

*supra*, that:

1.      D.S., prior to making the outcry accusations against petitioner to her "aunt," had accused an uncle, a brother of D.S.'s father, of sexual assault and, as a result, the "aunt" had "kicked" D.S. out of her house;

2.      D.S. had previously suffered and been treated for injuries to her genital area (as a result of falling from a tree and a bicycling accident) prior to making the accusations of sexual assault against petitioner and being examined by the SANE in connection with those accusations;

3.      D.S.'s paternal grandfather, Benjamin Smith Sr., had gone to the Emergency Room (presumably on December 22, 2005, the date D.S. was examined by the SANE), and D.S.'s "attending doctor" told him at that time that D.S.'s injuries "were old;"

4.      On an unknown date or time period, D.S.'s mother had told school employees at D.S.'s school that D.S's father, Rodney Smith, Sr., was not allowed to have contact with D.S. because he was sexually abusing her;

5.      D.S.'s paternal grandfather, Benjamin Smith Sr., who was arrested and indicted for indecency by sexual contact with D.S. in 2009, told his sister, Elizabeth Walker (petitioner's great aunt), at the time of his arrest that just prior to D.S. accusing him of the offense, he had caught D.S. stealing and smoking his cigarettes and had chastised her and the other children for such actions;

6.      D.S's maternal grandmother (petitioner's mother-in-law) had influenced D.S. to make similar allegations against others, including family, to get victim compensation monies to support the grandmother's crack habit;

7.      CPS investigations were opened in Oklahoma and Texas against D.S.'s mother and grandmother (petitioner's mother-in-law) for neglect, and D.S. and her siblings were "taken by CPS" when living in Oklahoma; and

8.      the State coerced D.S.'s mother (petitioner's sister-in-law) to cooperate in petitioner's prosecution by threatening to "lock her up and take her kids from her" if she did not.

The undersigned initially finds it is questionable whether the "new evidence" petitioner presents to demonstrate his factual innocence even qualifies as "new." Evidence does not qualify as "new" under the *Schlup* actual innocence standard if "it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." *Hancock v. Davis*, No. 16-20662 (5th Cir. Oct. 23, 2018), *quoting Moore v. Quarterman,* 534 F.3d 454, 465 (5th Cir. 2008). With the exception of paragraph Nos. 5. and 8. above, petitioner has not shown the above information was unavailable to him or trial counsel

at or before trial.  Even so, the undersigned will consider all of the above information as "new" for purposes of this argument and notes <u>none</u> of the above information was presented or even referenced at trial by defense counsel or petitioner.

Secondly, the undersigned finds it is a leap to recognize such information as being sufficiently credible, reliable or otherwise trustworthy evidence of actual innocence as required by *Schlup*. Examples of credible, reliable evidence of factual innocence identified in *Schlup* include exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.  Here, the above new information is conclusory, self-serving, unsupported by any recognized form of admissible evidence, and is based on hearsay.  The undersigned does not find this is the necessary level of credible, reliable or otherwise trustworthy evidence required by *Schlup* to support a claim of factual innocence.

Lastly, even assuming *arguendo* that the above information, which was not presented at trial, is new, credible and reliable, the undersigned finds such information does not prove petitioner's factual innocence of the convicted offense.  Instead, such information goes only toward the sufficiency of the evidence to find petitioner guilty of the convicted offense or the credibility of the witnesses.  The above information, even if true, would show, at most, that:  there could possibly be an alternative explanation for the SANE's medical findings rather than solely the chronic penetration of D.S.'s vagina; D.S.'s credibility could be questioned if making similar accusations against others when she testified no one else had sexually assaulted her, other than those she identified; that D.S.'s mother had attempted to prevent D.S.'s father from contacting her at school by stating he was sexually abusing her; that D.S.'s paternal grandfather had suggested a reason for D.S.'s later similar allegations against him; that D.S.'s maternal grandmother may have had self-serving motivations to encourage others to make similar allegations against petitioner; that D.S.'s guardians may have neglected her and her siblings; and that D.S.'s mother may have been "strong armed" to follow through on D.S.'s accusations. The above information, however, does not exonerate petitioner from wrongdoing or demonstrate petitioner is actually, factually innocent of the charged offense of sexually assaulting D.S.  Moreover, petitioner

testified at trial that D.S.'s grandmother (his mother-in-law) had been behind prior accusations against him and that she attempted to extort money from him.

Petitioner has failed to present the necessary credible and colorable showing of factual innocence to establish an actual innocence gateway for his time-barred claims.  Namely, petitioner fails to demonstrate actual innocence by presenting any new, reliable, evidence not previously presented and unavailable to him in the underlying proceedings, sufficient to demonstrate his factual evidence and persuade this Court that it is more likely than not that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt" so as to convict petitioner in light of the new evidence. *McQuiggin*, 133 S.Ct. at 1928 (*quoting Schlup*, 513 U.S. at 329).  Petitioner has not sufficiently demonstrated his "actual innocence" of the convicted offense as a gateway or exception to, *i.e.*, a means by which to avoid or be excused from, the procedural bar implicated by petitioner's failure to timely file his petition within the applicable statute of limitation.  Consequently, petitioner has not overcome the time bar for filing his federal habeas corpus petition.

IX.
FINAL FINDINGS AND CONCLUSIONS

The undersigned makes the following findings and conclusions:

1.    The one-year statutory limitation period was not equitably tolled.

2.    Petitioner's federal habeas corpus application, filed **September 11, 2017** when petitioner purportedly placed the application in the prison mail system, was filed 6 ½ years **after** the expiration of the statute of limitations and **is time barred**.

3.    An "actual innocence" exception to the time bar is not applicable to this case.

X.
RECOMMENDATION

For the above reasons and the reasons set forth in respondent's Preliminary Response filed November 21, 2017 [ECF 16], it is the RECOMMENDATION of the United States Magistrate Judge to

the United States District Judge that the petition for a writ of habeas corpus filed by petitioner ALLEN

ALEXANDER NEWSOME be DENIED as time-barred.

XI.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of these Findings, Conclusions and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED March 30, 2020.

*Lee Ann Reno*
LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

**\* NOTICE OF RIGHT TO OBJECT \***

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).